A third case for argument today is State of Coats v. Hawthorne. Mr. Orth, you're up, sir. Thank you, Your Honor. May it please the Court, Phil Hawthorne. And we're here on oral argument as requested by the Court. This case is on appeal based upon a motion dismissed by, granted by the District Court Judge. The main issue, or one of the main issues that we have a problem with, Your Honors, is the fact that we weren't granted any discovery, even though requested prior to the motion dismissed being granted by the Court. This case is significant in that it involves the death of an inmate while in custody of the Sheriff's Office. And the areas that we requested discovery on, Your Honor, are two crucial areas that we requested discovery on, is that there were inconsistencies with the police report, with the reports given by the Sheriff's Office based on the information that we had collected from a cellmate of our client who was killed while he was in prison. The cellmate gave a totally different story as to what the facts were involving the death of our client. He was in the same cell? They were in the same cell, Your Honor. They were the only two in that cell, Your Honor. According to the facts that we had, our client, who was a known habitual drug offender, was given a courtesy drive, which is questionable by a deputy, without a search, without any type of handcuffs, anything. And during this transportation of our client, our client had drugs on him and he ingested these drugs while on that ride. Did the driver know he was eating the plastic bags? They were in a plastic bag, Your Honor. Did the driver know? No. We don't have any information as to what the deputy knew or didn't know at that time. During that trip on the way home, the deputy looked at his screen and found out, apparently, that there was an outstanding warrant for my client. At that point, it was a custodial arrest because he knew at that point in time that there was a violation of the law. Is there any allegation that any of the officers or the nurse knew that he had ingested the baggies of the drugs? No, Your Honor. We don't have any information as to that because we don't... The reports given by the county regarding that don't give us that information. And unfortunately, our clients got around to do that, and our cellmate was not there. The cellmate wasn't there at the time. The only two people involved were the deputy and our client, and we weren't given any chance for discovery on that issue to determine that or to find that out. There was no autopsy? There was an autopsy, Your Honor, but we requested that prior to filing this case. And we were not given that information by the government claiming that there was a criminal investigation going on, yet they, in turn, sent information to the Attorney General's office saying, we didn't do anything wrong, there's no criminal action here, no anything. But we never got that autopsy report, and that's one of the things that we wanted to get in discovery at the district court level. Because what the government was saying and what we had are two conflicting stories. And we had requested that, and the judge denied that twice. Are you saying today that the cellmate was in the cell when he died? Your Honor, I'm sorry? Are you saying today that the cellmate was in the cell when he died after the nursing and treatment? Yes, Your Honor. Our client had seizures while he was, apparently the bag broke in his stomach, he had seizures. It was called out to the people in the sheriff's office. They responded. They looked him over, and despite that, they left him in seizures and said he was okay. But they responded. They did respond, Your Honor. There was a series of officers and the nurse came in, took his blood pressure, took his pulse. They did respond, but they left while he was still in seizures. But doesn't that doom a deliberate indifference claim? Doesn't that doom a deliberate indifference claim? They did provide some treatment or care. They did, but he died shortly thereafter, Your Honor. It wasn't minutes afterwards. Did he tell them he ate the drugs? It was the drugs that... Did he tell them, the nurse and the people who were trying to help him? We don't know what was told, Your Honor, because we weren't given any leeway as far as discovery was concerned. The only information that we were allowed to have was from the cellmate who voluntarily, after our client died, saw it in the newspaper and came forward. We didn't even seek him out. We wouldn't even be here but for the information that he voluntarily submitted to the family members of the deceased. Because of that, then we requested the autopsy report. We were denied that. And that's all the information we have other than what was provided by the government after the fact, which was totally inconsistent with what the cellmate was saying. As far as the time period, as far as what was said, what was done. After the initial response by the nurse, our client passed away and it took them two hours for them to come back, even though the cellmate was screaming out there that his cellmate was dead. They took two hours to come back while they were handing out food and at that point they finally realized the individual was dead. Or they thought he was dead. They didn't act that way but the cellmate said he had been dead for two hours. At that point in time, they did a cursory investigation, loaded him on a gurney and took him to hospital, claiming that he was basically alive and wasn't dead. We have tried to get the discovery we need to prosecute this case, but we were denied by the district court judge. And we believe that that in and of itself is a significant problem that this course has to address. When we have a government entity that controls the information regarding a negligent action, does not release that information, covers that information up and it was surprising that this case was investigated by a Texas Ranger. This same Texas Ranger became a ranger based upon the recommendation of the sheriff that we were dealing with. And not only that, but the Texas Ranger who investigated this incident had a conversation with the cellmate. And the cellmate, according to the cellmate's testimony, he gave the ranger at least several pages of information as to what happened. And the ranger instead of taking that, gave it back to the cellmate and said, I don't need that. So he disregarded, the investigating officer disregarded the cellmate's information and testimony in his investigation. And they came up with, there's no problem, the sheriff's office did everything that they should have. No surprise. It is because of that that we're asking the court to remand the case so we can get at least some discovery in this case. And the government is not going to be penalized in this instance because they will still have the right to come back after discovery and file a motion for summary judgment under Rule 56 and come back before this court or before the district court and argue. So there's no harm that the government has by allowing this court to go back and allow us some discovery in this case. As far as the other issues, Your Honor, that will probably be brought up. As far as the role of death, this court has routinely held as late as June 21st in the case of DePaz-Gonzalez v. Duane that when you sue a county for the individuals that are acting on behalf of the county and they are negligent or fail to take the claim, or I should say make failures in their duties and obligations under the law, that they can be held accountable. And in that case, the court was citing the Rind case, and that's in our brief, Your Honor. And that's a 25, 30-year-old opinion in which it is similar to this in which Henderson County and its elected sheriff were held liable for the wrongful death of the plaintiff that died in their custody and care. So the case should not have been dismissed based upon subject matter jurisdiction. As far as the 1983 cases, Your Honor, the public has a right to information. We were not given that information, essentially the autopsy report and other information, based upon the acts of the sheriff's office as well as his civil limits. And because of that, their constitutional rights under the Eighth Amendment and 14th were denied. And therefore, the court should send that back also for that reason. Let me stop you just to clarify. You've got three different sets of claims, right? You have the claim of the Texas wrongful death act, right? Yes, Your Honor. And then you had a 1985 action. Section 3, Your Honor. Right, and then you had a 1983, right? The 1983 claim and the Moroccan. Yes, Your Honor. All right, so those are the three. Those are the claims, but the main issue deals with discovery. Because we can't flesh out those claims without some discovery. Did you try to propose the settlement? What, Your Honor? Did you try to depose the cellmate? We didn't depose the cellmate. We have a statement from him under oath, but we didn't depose him. We tried to get some discovery done, but the court wouldn't allow any discovery. Okay, on your wrongful death action, the court found that you were suing the sheriff in his official capacity and that there was some jurisdiction on that point, right? Yes, Your Honor. All right, so what do you say? I'm just taking on one, two, and three to make sure I don't have it fall around in my head. So as to that, what do you say? I'll address those points, Your Honor. As far as the death claim or the 1983 claim, as indicated earlier, in the Ryan case, there were death claims against Henderson County and its elected sheriff, and the Ryan court affirmed that both the wrongful death of the claimant, the plaintiffs themselves, and the survival claims of the defendant were available under 42S 1983. And it's our claim that, based upon the limited evidence that we have, is that the sheriff was running the prison at that time, and his subordinates, which were the nurses, which were the individuals that were responsible for the care and control of the plaintiffs and their safety, violated a judgment. But what you do, the other side is saying, the cases say that that suit under the Texas wrongful death, I understand what you're arguing in terms of who the people on the ground, but that's a suit against the sheriff, which is tantamount to a suit against the county, which the cases don't allow you to bring that claim against the county, so the court dismissed you as a matter of law, finding that's not something that discovery is related to, that's related to who you sued, and that's why I'm taking a one, two, three. So as to that claim, it's a dismissal. The dismissal said, yes, you quit, but who you're really suing is the county, and the cases disallow you suing against the county. So I'm trying to encourage them, I'll get you 83, 85, but as to that claim, that's a dismissal. Discovery's not at the heart of your opposition to that, is it? It is, Your Honor, in that the county is, this court has held that when you're doing wrongful death against the county, it's not just the county itself. If we sued just the county, I would agree with Your Honor. But we didn't sue just the county, we sued the sheriff and his officers and his subordinates also, especially the sheriff, who is responsible for those individuals that committed the negligence and caused the death of our client. All right, I got you there. All right, so just tell me real quickly, what's the best case that pushes back or that helps you when the other side and the court said no, no matter what you're saying, the suit itself is against the county, and here are the cases that say you're saying, excuse me, I'm just trying to look, what's your best case to get you over that hump? Okay, the cases that were cited in our brief, Your Honor, and like I said, the latest one was in June of 21, and that was by this court, and that was DePaz-Gonzalez v. Duane in an unpublished opinion. But in that opinion, the court was citing the Ryan case, which that involved a wrongful death claim against the county and its elected sheriff, just like we did. And in that case, this court held that both the wrongful death claim and the plaintiffs themselves and the survival claims were available under 42 SC 1983. So the distinction, and it may be just, I might have it wrong, Your Honor, the distinction between suing the county in and of itself, yes, I would agree with the court that we can't do that because they're not a person under the law. But when you take the sheriff, and the sheriff is, even though he's part of the county, we shoot him in his individual capacity as far as the wrongful death under the state claim. So when you take the individual that worked for the county and go after them, it's different because they are individuals, and this court has held that they're individuals. This is not a new issue before the court. Okay. All right. Well, you've got a red light, and you've covered the ground. Let's hear from the other side, and you preserve your rebuttal time. Thank you, Your Honor. All right, Mr. Jones. All right, counsel says, yes, facially, it may look like he's suing the county, but he's really not. He's trying to get at the underlying actors who really did this, and so that unless he knows through discovery or otherwise who they are, the only person he can put in there is, you know, the sheriff. So he's saying this, you know, he's in a box. He understands he's suing these other people, but you all want to tell him who the other people are, so the only person he can name is the sheriff. If you give him the information, he'll be happy to amend his pleadings to say that. You say King's X, you really sued the sheriff, the county, et cetera, you can't. Am I understanding the positions? Sort of? Sort of, Your Honor. Please accord, I'm Norman Giles, represent Chambers County, its sheriff's department, and its sheriff who was sued only in his official capacity. There's no individual capacity claim in this case. The sheriff was sued in his official capacity only. The county was sued directly, and they tried to also sue the county through its sheriff's office. So all of these claims are against Chambers County. And I want to get to the, what I intended to do was talk about the lack of deliberate indifference and the lack of any policy, but first I've got to clear up this discovery issue. There is no court order limiting discovery. There's never been any order by the court limiting discovery. The parties conferred at the outset of litigation, we filed a joint discovery case management plan, which had no request to limit discovery in any form. The court entered a discovery order that had no limitations on discovery whatsoever. This is not the kind of case where we have qualified immunity at issue and then the discovery would be stayed because there's no individual defendants in this case. Was there a request for the autopsy? And a copy of the soul mate statement? The appellants never requested any discovery. The appellants just responded to our motion and sat still. We served discovery on the appellants, and the discovery included the autopsy report, the ranger's report, all the videos from the jail. You're talking about you made your pre-discovery disclosures. Yes, Your Honor. But they would say, if I apprehend their argument, that they made these public records requests to the state and to these entities that were investigating, and they had gotten stonewalled. They refused to provide all these things. They say that they allege a conspiracy to do that, to keep the information from them about their claims, and so aren't they in a catch-22? They can't develop their claims and then they get dismissed because they don't plead enough facts. Well, they certainly can develop their claims, but first off, the rangers were controlling the investigation, so the rangers were controlling when their records were going to be released under the Public Information Act. But that investigation occurred well before the litigation, and then the litigation came later, and there was never another request made under the Open Record Act after the investigation was concluded. The records were withheld by the ranger because the investigation was still ongoing when he made the request for them. But he never made the request again through the Open Records Act after the investigation was completed. But regardless of that, within seven days of their initial response to our motion to dismiss, then I disclosed all of those records to the appellants. The appellants had the opportunity then to amend the complaint if they thought that was appropriate and seek that, or they could have done any kind of other discovery. They could have sent a request for production to us if they thought they needed something other than what I disclosed. But in the disclosures, they received all the recordings, all the reports, all the autopsy reports. And so they never asked for depositions either. They just sat on their hands, and now they're making the same argument in this court based upon what they did before they ever filed a lawsuit on their open records request. What reminded me, was this dismissal with prejudice? It was with prejudice. Yes, Your Honor. And so they had seven months. The judge entered a scheduling order which allowed the appellants seven months to do discovery before the judge ruled on the motion to dismiss. And so at least by the time that I disclosed all those records, very early in the litigation, and all the dates are specifically briefed in the briefing as to when those records were discovered or were disclosed, but it's a very initial part of this litigation. So it certainly was within the time the appellants could have moved for leave to amend the complaint, add the other information they got from those records. But again, we're hearing the argument now as if they still don't have them. They've had them for months and months and months. It's just a situation where they've not done any discovery. Nobody's hiding the records from them. The court has not prohibited them from obtaining discovery. All right, but this is a Rule 12 motion. It is. So we're looking at the complaint. We are. And as I read it, one of the things they allege in the complaint is that the sheriff's office generally knew about the decedent, knew about Mr. Cooks because mom and cousin worked at the sheriff's office and he was sort of a repeat visitor to the sheriff's office over the years, had a drug addiction, very serious drug addiction. The complaint alleges that that was known by the sheriff's office. Doesn't that feed into the subjective knowledge of the people who allegedly provided no care or denied his medical needs? No, that shows that they knew him. They knew him, but they knew he had a drug problem. This wasn't just small-town America. They knew he had a drug problem. They knew that he had been in and out of the criminal justice system there locally. I guess what I'm getting at is back to the point you originally raised, this deliberate indifference claim. Doesn't it go to show at the Rule 12 stage that there was deliberate indifference here because they knew who this was? I don't think so, Judge Wilson. I don't think so because there's a difference in having a drug problem generally and being under the influence of drugs to the extent that it's an emergency medical situation. Well, but he's seizing in the cell. He's having seizures. Well, when he was put in the police vehicle, he wasn't seizing. He was transported from the police vehicle to the jail, and when he got to the jail, he wasn't seizing. He's in the jail for a period of time before he starts seizing when he's trying to expel the methamphetamine he had swallowed. So he wasn't actually seizing until he swallowed the methamphetamine and then was trying to expel it in the jail. And the law enforcement officer would know that he often had a drug problem, but not that he was suffering from an immediate drug problem at the time that he was in this particular situation. But the nurse comes in and takes his pulse and takes his blood pressure. He's good. And he's seizing, and he continues to seize. I mean, I'm just grappling with how that's not cognizable at the Rule 12 stage. Well, I'm not sure that the allegation or exactly that he's continuing to seize after that. I think that it basically shows that there are some the first time that he makes the report, according to the allegation in the complaint, when he first makes the report, when that first comes to anyone's knowledge, then a group of deputies went to him to offer assistance. That group of deputies also brought the medical person there. The medical person was offering, basically she did all of his vitals and did all those things. And then the nurse, the licensed vocational nurse, she concluded that there was an immediate need for further care at that point. There's no allegations that he's still seizing after that happens and officers are watching to see if any of that happened. Was there evidence or discussion that he was seizing before the nurse came in? Well, that's what prompted the nurse to come in. Another inmate was with him in the cell, and he was on the toilet, and he started seizing. That's when the deputies came, and then that's when the deputies summoned the nurse. And that all happened very quickly. As soon as the first officers knew that there was a problem, they responded quickly. The nurse responded quickly. Now, the nurse made her evaluation. Now, maybe the nurse's evaluation was incorrect, but then that's the malpractice issue. That's not a deliberate indifference issue. And there's no allegations in the complaint that show that the deputies are saying any more seizing after the time that the nurse came in. Is there anything in the record to show when he got to the jail, whether he was communicative, whether he said anything, whether anything was said to him? He wasn't really hooked in, was he, or was he processed? Is there anything like that? Well, he was processed, yeah. He came in. He was fine when he came in. When he came in, he actually made four phone calls to his family. He spoke with a captain in the jail. He was upset because he had been brought to jail. He voluntarily got in the car to get a ride, and then when he was getting the ride home, he was brought to jail when they found out he had a warrant. He was upset about that, and he made a complaint. It was a complaint for the jail personnel that he got arrested, so the captain actually went and talked to him and tried to explain to him why he got arrested. He's coherent. This isn't a situation where they brought in somebody who's already certainly showing signs of being under drugs when he arrived. That happened later when the methamphetamine that he swallowed burst when he was trying to expel it. I guess I was asking along these lines, is there anything in the record that evidences his complaining, I don't feel good, I'm having this, something's wrong, versus the cellmate? No, nothing. When he went to the jail, did they take other drugs from him? Yeah, they found actually in his backpack, he had other drugs in his backpack that they recovered, and they actually filed a charge based upon the recovery of the methamphetamine in the plastic bag that was in his bag, but they didn't know that he had swallowed other methamphetamine bags before that. They didn't know that he had swallowed those methamphetamines, they just knew he had them in his bag. But again, the whole idea that the appellants are not able, even the way I hear the arguments, they're still not able to know what happened so they can file the amended complaint, but they've had that information for months before the judge ever granted the motion to dismiss, so they've been sitting on their hands. There's nothing in the record that shows that they've been limited in any way to getting access to information, and they've had the information. So, at the very least, I would expect that whenever they received those disclosures, they would have at least asked for leave to amend the complaint, or done something other than sit on their hands, but certainly they were never prohibited from obtaining discovery. Well, we'll go to the 1983 claim, and the district court dismissed that at the 12B stage. I mean, looking at the complaint, why isn't that ample, if you will, to get past the 12B, with what they've alleged and the facts that occurred, it's different than if we were harassing over summary judgment. Well, I don't think that if you look at the factual allegations in the complaint, again, we've heard a story here based upon some... Well, I think if you look at the facts alleged in the complaint, you don't see any deliberate indifference at all for any of the employees. And you basically see is that once, from the facts alleged, you see that when the complaint is made, it's a medical situation, and the personnel come to address that. And then beyond that, they call the nurse. The nurse then makes their medical evaluation, and then you have the situation where the other officers could reasonably rely on the medical evaluation of the person who's trained for medical evaluation. So I don't think if you look at the actual factual allegations in the complaint, you're going to see anything that shows the deliberate indifference of any employee. Well, but one of the problems we've got, I guess, is the district court didn't see it, but the district court didn't give us but, like, a sentence saying, well, they're not enough alleged to show deliberate indifference. There's no analysis of what's actually in the complaint or anything like that. Is that reversible error? No, I don't think it is. I think that the judge did make an analysis of the factual allegations. I think the judge's analysis of the allegations was that there weren't any allegations that showed deliberate indifference. Well, I mean, it's literally a sentence on page 15. I think I've got the sum total of his analysis on deliberate indifference, and it just says there's not any. How's that enough, given what they allege in the complaint about what was happening? Well, maybe it isn't if there's some officer sued here, but the county is sued. They sued the county. They've got to show an employee was deliberately indifferent first. If you were to read those allegations to show that an employee was deliberately indifferent, then to avoid the dismissal, they've got to still allege facts that show that the county can be liable, and there's no factual allegation at all showing any basis for governmental liability against the county. There's no policy, no factual allegation for policy. There's no factual allegation that in any way connects the sheriff to this event. There's no factual allegation that shows any way that there could be any liability against the county based on those events. Even if you were to read the complaint and say there's potentially an allegation of deliberate indifference by an employee. Are you saying the pre-discovery, whatever that is, contains information from which if plaintiffs weren't, as you say, sitting on their hands, discern names of people so that the complaint couldn't name other than the county? In other words, are you saying what was given to them has information that if news would get around this, only the county had been sued? Judge, sir, that is absolutely correct. It has all the reports from the county. It has all the ranger reports. It has all the recordings that were there. It has the information about what the cellmate said. It has all of those details that were available to the appellants where they could very easily have identified some other deputy or individual that they want to, but they've actually got the names of some of the individuals in the complaint now. So if they wanted to sue them, they could have already sued them. They listed their names in the complaint already. You may have been asked this before, and I didn't hear the answer of who passed it. Was there a request to amend the complaint between the time you filed the motion to dismiss and the court moved on it, or is it pending? The complaint we're looking at, this is the live complaint, and the only one that's been filed. Now, Judge Brown actually had a procedure at the time to where, before we could file a motion to dismiss, we had to confer with the other side and tell them what we were going to raise in the motion to dismiss and ask the party if they were willing to or if they wanted to amend the complaint. When I did that, the appellant's counsel said that he had no interest in amending the complaint. That's actually documented in the motion to dismiss. I had to put that on as a certification that I actually had that conference with the appellant's counsel. Then, of course, once I filed the motion to dismiss, then the appellant's counsel had the opportunity to then, if they needed some other information, to then file an amended complaint at the time I filed my motion to dismiss, or any time after that, after they received the disclosures, they could have also moved to amend the complaint. There's nothing that prohibited the appellants from obtaining this information they claim they need. All they had to do was, it was there for the taking if they wanted more, but they have it in their hand already. It was given to them early in the litigation. The dates of the disclosures are in the Joint Case Management Plan. The parties agree in the Joint Case Management Plan when to exchange disclosures. Here's the dates on there. The appellants received the disclosures. Give me a quick snapshot of time. From the time the complaint was filed and this predisclosure or whatever, how much time elapses before you file the motion to dismiss? There was a while before we filed the motion to dismiss. I don't think that the service happened right away. There was a period of time before that happened. Weeks? Months? Years? I think months. Again, it's in the briefing. It was months. I made the disclosures within 10 days of the date that they filed their response to the motion to dismiss. Very easily at that point, if they needed to amend the complaint, all they had to do was ask. No doubt the judge would have allowed it. I would not have opposed it if they wanted to amend the complaint at that time. But there was no request for leave to amend the complaint. There was no request to file it with the court asking to leave to amend the complaint. This is not a situation where they're prohibited from having information. This is a situation where they're sitting on their hands, not doing anything, except trying to claim foul. They're still doing that today, even though they've had these records for at least months, if not years at this point. I'm not speaking for my colleagues, but I'm confused. I'm confused. You told us when you came up, you know, you don't have the information. They won't give it to you. You don't know who the people are, et cetera, et cetera. Counsel's office says pre-discovery. They turn all this over. You've got it in your hand. You heard the question. Did you ask to amend, et cetera, et cetera, et cetera. So, I mean, what is the state of affairs? Do you acknowledge in hand some kind of pre-discovery? No, Your Honor. Well, where is it? I don't know where it is. Now, as far as the procedural history goes, the original complaint was filed on 7-6-23. The motion to dismiss was filed on 9-5-23, two months later. Did you confer with counsel's offices before the motion to dismiss was filed to go through deficiencies in the complaint? The counsel did send us a letter. And we discussed with him that we didn't need any – there were no deficiencies in the complaint based upon the information we had at that time that we could file an amended complaint with, because we weren't given the information from defendants. I don't know where these disclosures are, but we didn't see them. Are you the original counsel? Are you the counsel from day one? Yes, yes. So they only would have been dealing with you?  And as far as counsel's saying that we had plenty of time to do everything, on 4-10 we filed a motion with the court because we had gotten a docket control order. They never filed an answer in the case. So we couldn't go forward with discovery until we had an answer filed so we could even do anything with the case. We filed a motion with the court on 4-10 asking for discovery from the court, asking the court to allow us discovery. And the fact that several dates had passed already – in fact, one of the dates was our designating of our expert at that point in time. And it had passed because we couldn't do anything until an answer was filed. The court then the next day gave us an amended docket control order with new dates on it and then dismissed the case a month later. We didn't file discovery because we were waiting on an answer from the defendant to file some discovery. They never filed an answer in the case. But you know when they file a motion to dismiss, they don't have to file an answer until that motion is resolved. And we were waiting on the court to resolve that. In fact, we asked the court in our 4-10 motion to the court, we were asking them to give us a ruling on the motion to dismiss so we could move forward. But if it gives you a ruling on your motion to dismiss and dismisses your case, how is that helping you? It's not helping us. We needed discovery and we needed time to get it done. Well, counsel has said to us in oral argument that there's some package of information that you just said there that was given to somebody. That's why I asked were you the same lawyer. Sometimes the lawyers can change. But if you're the original lawyer and he's saying there's this information with the cellmate information, et cetera, et cetera, which ostensibly would allow filing a suit against other than the county, but to name individuals. He says there's no complaint against other than the sheriff and the county. Is that correct? Is there any individual claim in the complaint? Just the sheriff and the county, Your Honor. All right. So you know axiomatically that there is no lawsuit, there's a matter of law, against the county itself. And we've got legions of cases that say if you sue the sheriff, that's the same as suing the county. So that's not a matter of discovery. I mean, that's what the Hornbook law is. So if your claim is against these other individuals, how would you get that if you only laced a claim against the sheriff and the county? That's why we requested discovery, Your Honor. The only information we have, we did not have the autopsy report. We did not have, all we had was a report from the county that the sheriff did say, we didn't do anything wrong. There's no information or no individuals named in that report that indicated any negligence that we could go after or amend the complaint with. All right. Let me ask you this. One, two, three. Aside from you, what do you have with respect to this incident? Judge Clement asked about the autopsy report. Do you have that? No, Your Honor. What do you have besides the complaint? The only thing we have is the information that I indicated before, the stuff that we got pre-suit. But he's saying the stuff you got pre-suit contains the information of the names, et cetera, et cetera. No, there was no information given to us pre-suit. When we filed the lawsuit, we were going based solely on the information that we had from our cellmates and the report from the county indicating we didn't do anything wrong. Well, does the report from the cellmate give names of other people in the jail who would have been arguably culpable for the act, too? No, Your Honor. He didn't give any names to the individuals. He just gave us information as to what happened, but he didn't name any individuals. Okay, well, Judge Clement asked a question. I think she said, was there an effort to depose the cellmate? No, we didn't depose the cellmate. We got a statement from him under oath. Council Officer says there's no standing order or any other order that bars any kind of discovery. So had you sought to depose the cellmate? I hear you that you didn't, but if you sought to depose the cellmate, are you saying there's some order or something else that would have prohibited you from doing it? There was no order prohibiting us from deposing the cellmate. But we already had his information. He didn't know the names of the individuals. He came to us voluntarily, but we didn't depose him, no. I understand. Well, I mean, we're not judging anybody, but I mean, we get a lot of 12Bs. I mean, normally in a case like this, the argument might be over the sum of judgment. Not a 12B. First question we ask, well, did you ask to amend or get a change? Judge didn't allow it. Then we might say, hold him up. Why not? Council Officer says, well, there was no request to amend. You say you didn't request to amend because there was no basis to do that. So I mean, it can't be one way or another, but on a 12B to throw you out of court totally, there's not any wiggle room in terms of discovery. We affirmed in the dismissal King's X. I mean, the case is gone. That's why we're asking all these questions to figure out. He says something was given to somebody. It's not within our prerogative to figure out where it is, but everybody's an officer of the court. And what we have is an appeal from dismissals by the district courts. And you're doing a 12B and a complaint. It's either you can't sue the county. That's the law. So the question is, that's why I asked you on your 1983 claim, what about the viability of the 1983 claim? And what's your best argument in terms of staying in court on that? So I'll just ask you one last time, what's your best case? Just tell me. It's in the brief. I'll go read it again. The best case as far as the 1983 case, Your Honor, or the best case regarding the whole case? The best case that we have is that it was conscious indifference by the employees of the sheriff. Well, I mean, that's your argument. That's not what I'm asking. I'm asking, what's the case leaving the bench? We need to pull and read and read again in order to reverse the district dismissal of this case based on your section 1983 claim. That's all I'm asking.  I misunderstood your question, Your Honor. Sorry. That would be the Ryan case, Your Honor. OK. All right. That's it. All right. Thank you, counsel. We appreciate both of your briefing and arguments in the case. The case will be submitted along with the other cases that were argued, as well as the NOAs, and we'll get it decided as soon as we can. That concludes the oral arguments for today. The panel will stay in recess until 1 o'clock tomorrow.